**Affirmed and Opinion Filed December 19, 2023**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-23-00586-CV**

**IN THE INTEREST OF E.C., A CHILD**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-30006-2022**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Reichek, and Miskel
Opinion by Justice Partida-Kipness

Following a two-day bench trial, the trial court terminated Father's[1] parental rights to his son, E.C.[2] The trial court found by clear and convincing evidence that statutory grounds existed for the termination of Father's parental rights to E.C. and termination was in E.C.'s best interest. *See* TEX. FAM. CODE §§ 161.001(b)(1)(F), (O), 161.001(b)(2). The trial court signed a termination order based on those findings and named the Texas Department of Family and Protective Services (the

---

[1] Mother voluntarily relinquished her parental rights to E.C. and is not a party to this appeal.

[2] We refer to E.C. by initials and use pseudonyms or initials to refer to each of E.C.'s family members to protect E.C.'s identity. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

Department) the child's Permanent Non-Parent Sole Managing conservator and ordered E.C. to remain in his current placement. After reviewing the parties' briefs and the record, we affirm the trial court's order terminating Father's parental rights.

**BACKGROUND**

Mother and Father have two children together; V.C. was born in August 2017, and E.C. was born in March 2020. The Department opened a conservatorship case as to V.C. in March 2019. Father relinquished his parental rights to V.C. on August 12, 2020, and the trial court terminated his parental rights to V.C. in an August 31, 2020 final order. The court appointed Mother as V.C.'s Sole Managing Conservator. Although the final order in the V.C. case is not at issue here, information obtained by the Department during that case is relevant here. The V.C. proceeding also marked the first of three proceedings forming the basis of the current case.

**I.     The V.C. Proceedings**

According to Mother, Father assaulted her more than three times during the V.C. proceedings. One of the assaults occurred when she was pregnant with E.C. and required her to go to the emergency room. Mother's caseworker at the time, Jannell Dickerson, received a call about the assault and met Mother at the hospital. Dickerson testified the incident occurred when Father and Mother got into an argument. When Mother went to the bathroom to escape the situation, Father pushed her. Mother called the police and was taken to the hospital. Mother told Dickerson she was afraid of Father and "was tired of always fighting with him, and she didn't

–2–

feel safe." Dickerson told the court Mother had expressed similar fears in previous meetings. Mother also told Dickerson she wanted to leave the relationship and be safe for herself and V.C.

Mother later mentioned the assault to Michelle Behl, Mother's caseworker during the last three months of the V.C. proceedings and throughout the proceedings related to E.C. Behl testified she had many conversations with Mother during the V.C. proceedings about protecting herself, the difficulty in leaving a violent relationship, and the dangers of returning to one. Mother also told Behl that Father was no longer living with her and the children and was "not even involved." Although the Department knew of the past domestic violence between Father and Mother, the Department did not intervene as to E.C. at that time because E.C. was "born clean," Father had no presence at Mother's home during the final ninety days of the V.C. proceeding, and Mother told Behl "she had ended the relationship and that she was going to move to her mom's home for safety." It appeared to Behl that Mother had "ended the relationship and appeared protective of her son."

But concerns about the safety of E.C. arose the same day the hearing in the V.C. case ended. According to Behl, she went to Mother's apartment to drop off diapers after the hearing. When Behl approached the apartment, she saw someone she believed to be Father walk to the apartment door, unlock it, and go inside. The man was carrying what appeared to be groceries. When Behl confronted the man and asked who he was, Father gave her a different name than his own. At that time,

Behl did not know the whereabouts of Mother and the children. She yelled into the apartment from the front door for Mother, but no one answered. Behl took a picture of the man and sent it to the ad litem, who identified the man as Father. When Behl spoke to Mother on the phone later that evening, Mother identified the man as her brother. Mother only admitted the man was Father after Behl told Mother Behl had confirmed the man was Father.

This encounter worried Behl because she did not initially know the whereabouts of Mother and the children, and she had concerns about potential domestic violence between Father and Mother. It also concerned Behl that Father had an entry key to Mother's apartment because his rights to V.C. had been terminated and Mother insisted she no longer had any contact with Father "because she was fearful of [him]." When Behl reported seeing Father at the home, she was told to make a report due to the violent behaviors Father had displayed in the past. Behl testified: "The issue was that [Father] was in the residence when it was a danger to the children that he was there at that time." When Behl could not locate Mother after making the report, she referred the case to the Department's investigations unit. That unit discovered Mother had left Texas and moved to Massachusetts.

## II. The Massachusetts Proceedings

The record shows Father and Mother left Texas with the children after Behl confronted Father at Mother's apartment. Mother later testified she was afraid to stay in Texas because she thought the Department would take the children away from her

after seeing Father at the apartment. In Massachusetts, Father, Mother, and the children moved in with the paternal father, paternal step-mother, and other members of Father's family.

After discovering Mother moved to Massachusetts, Behl sent a referral to the Massachusetts Department of Children and Families (MDCF). The MDCF opened a case on September 1, 2020. Andrew Daher was the MDCF caseworker assigned to the case. He testified MDCF opened the case because of Behl's referral for a welfare check on Mother and children. Father told Daher the family "fled Texas" because a caseworker saw Father at Mother's apartment after she was awarded custody of V.C.

Daher completed an assessment and included "active plan tasks" for the parents. During the assessment, Mother and Father admitted to using marijuana in Texas and "during the assessment period" in Massachusetts. Mother reported she and Father were fine, and both parents denied any issues regarding mental health or substance abuse. Daher requested they engage in therapy or at least undergo a mental health evaluation and substance abuse evaluation, but they refused. According to Daher, Mother and Father "said they were not going to engage in the action plan."

When MDCF ran a routine check for open or closed criminal charges for Father, they discovered a restraining order had been issued against him within days of arriving in Massachusetts. The check also showed Father had a criminal history and was a sex offender. After reviewing Father's Texas file, the State of Massachusetts identified him as a Level 2 offender, which prompted the police to

contact Father. Later checks showed an open warrant for Father's failure to register as a sex offender and a warrant issued August 24, 2021 for threats to commit a crime.

Daher described the risk to the children as "always medium to high," but stated MDCF could not take legal action because Mother was meeting the minimum basic needs of the children. MDCF nonetheless kept the case open, and Daher continued to monitor the family and discuss issues if they arose.

Over the following months, police responded to additional calls regarding domestic violence within the home, and the responding officers then made calls for service to MDCF. Daher continued to meet with family members to get updates and responses for these calls of service and to follow up to see if they would participate in any of the services he was recommending. Mother and Father continued to decline to engage in services. Father told Daher the allegations against him were false and the result of the Department retaliating against him. MDCF was also concerned about E.C.'s health because Mother did not timely provide medical paperwork for E.C. According to Daher, MDCF does not believe E.C. received any medical care during the first six months to a year the family was living in Massachusetts.

Father's mental health also remained a concern for MDCF. On March 18, 2021, Father and the paternal grandfather had a heated argument that ended when Father left the house and called the police. When officers arrived, Father told them he and Mother had argued because she locked him out of the home. He also told police he needed help because he was worried he was going to harm himself or

someone else. Officers transported Father to St. Luke's Hospital for evaluation, and Father was released the same day. Behl testified the police report from the March 18 incident said Father was "homicidal, suicidal, and that the police department offered him services and took him to get evaluated." Daher testified the medical records from St. Luke's Hospital indicated Father "had a mental breakdown" and had "some suicidal ideation."

Daher met with Mother nine times between September 2020 and March or April 2021. Father was present at those meetings. By March or April 2021, Father had moved out of the home and "was no longer in the picture." Daher continued to monitor the family and meet with Mother. According to Daher, the MDCF case remained open because of "a lack of compliance and there was ongoing instability."

After Father moved out, Mother notified MDCF about an incident in Rhode Island in which Father was arrested following a brawl at a campsite. Father told the court he was originally charged with assault with a deadly weapon in the Rhode Island case but the charge was dropped to a misdemeanor. Mother also notified MDCF of warrants for Father's failure to register as a sex offender. MDCF did not take any action to remove the children because Father was not observed in the home and Mother denied she and father were together. The last time MDCF had contact with Father was in April or May 2021.

On December 18, 2021, Mother left Daher a voicemail saying she was fleeing Massachusetts and returning to Texas because Father had threatened her and was

threatening to take custody of the children. Police had been called to the home on December 17, 2021, and twice on December 18, 2021. When he spoke with Mother later, she "minimized the issue with [Father]" and said it was Father's parents who were mistreating her and the kids. She told Daher the paternal grandparents treated her like a servant and were controlling her life.

When Mother arrived in Texas, she would not give Daher her location, which meant a welfare check could not be completed. She told Daher she did not want Father to find her because he threatened to take the children from her in Massachusetts. Daher was concerned Father went to Texas after Mother and wanted to verify the children were safe. Because "there was a history of substance abuse or other related matters" on both sides of the family, Maher sent a referral to the Department requesting a welfare check and confirmation of the children's safety.

## III. The E.C. Proceedings

On January 4, 2022, MDCF sent the Department a "Priority Two referral pertaining to the Neglectful Supervision of [V.C. and E.C." by Father and Mother. referral on January 4, 2022. The referral provided in large part:

> [T]he family left Texas in September 2020 during a CPS investigation out of Plano, Texas. There were concerns then about domestic violence perpetrated by [Father]. The state of Massachusetts opened up a case with the family there and now [Mother] fled the state of Massachusetts and moved back to Texas with the children about a week and a half ago. [Mother] refuses to provide a current address. [Father] updated his address with the sex offender registry on 11/30/2021 with a McKinney address. [Mother] denies that [Father] is with her and the children.

[Mother] and [Father] both refused treatment in Massachusetts after acknowledging use of Marijuana. There was concern that [Father] may have relapsed on Heroin. [Mother] denies that [Father] is with her and the children.

[Mother] has three cases against [Father] for domestic violence. The last incident with [Mother] was on 11/30/2021. On 8/25/2020, [Father] had another domestic violence charge with another female. [Father] has a warrant out for failing to register as a sex offender. . . .

The Department assigned Investigator Devon Grigsby to the case. She enlisted the help of a special investigator to locate Mother and the children.

Grigsby tried to locate the family at a Plano address given to the Department with the referral. But neither Mother nor the children were at that address. According to Grigsby, Mother gave Daher different addresses to avoid being found. She heard "different stories" of where they were, including a suggestion they were in Colorado. Grigsby and a special investigator went to several addresses in Plano, McKinney, Irving, and Dallas but did not locate Mother or the children. Mother's great Uncle, I.G., and his husband, K.M. (collectively the Uncles) told Grigsby the children could be in Bonham, Texas with their maternal grandmother. The Uncles were correct. Grigsby located Mother and the children at the maternal grandmother's home in Bonham on January 11, 2022, a week after receiving the referral.

On January 11, 2022, Daher sent the following letter to Grigsby:

I am contacting you to follow up on the reason for filing a report of neglect and abuse . . . . Since the family's case has been opened, Mother and Father have not engaged in any services such as mental health services or substance abuse treatment to address ongoing concerns that are especially in Father's presentation and actions. Father has been hospitalized for suicidal ideation and is the aggressor in multiple

–9–

domestic violence with Mother and his paternal family. . . . Mother appears to struggle with her mental health and is not transparent with her relationship with Father similar to the same concerns that CPS had in the past. Her children have been exposed to neglect and both parents have been resistant with engaging the Department. On 12/18/21, The Department received a voicemail from Mother who stated she relocated to Texas but would not provide an address to verify she left without Father. The Department has made multiple calls to Mother who is concerned about providing her location as she stated she is worried the Texas CPS will take her children from her custody. . . .

When Grigsby located Mother in Bonham, Mother told Grigsby she had not spoken to Father, did not have his phone number, and did not talk to him on messenger. The Uncles had already informed Grigsby, however, that Mother and the children stayed with them from the time they returned to Texas before Christmas through the New Year holiday, and Father stayed with them Christmas Eve, Christmas Day, and over the New Year's weekend. Mother denied Father was in Texas for Christmas and "mentioned she didn't want this to happen because she didn't want to do services again."[3]

Grigsby obtained an emergency ex parte removal order on January 11, 2022, which she served on Mother and Father. Grigsby testified the removal was necessary because Mother was hiding the children from the Department and not allowing a welfare check to occur. Because of Mother's prior actions, Grigsby was also concerned Mother would leave Texas again to live with Father.

---

[3] Massachusetts closed its case after the Department located Mother and the children in Texas.

The children were removed on January 11, 2022, and placed with the Uncles. V.C. had been placed with the Uncles previously, and Mother did not object to the children returning to their care.

Grigsby notified Father of the removal by email and spoke with him January 12, 2022. Father told Grigsby he believed the Department called the sex offender registry and caused the warrant to issue against him for failure to register in Massachusetts. He also said he had not seen the children since September 2021 and was not in Texas at Christmas. Father was living in Massachusetts at the time of removal.

## IV.    Post Removal Proceedings

As part of its initial investigation following removal, the Department had E.C. drug tested. He tested positive for marijuana. E.C. was twenty-two months hold at the time of removal.

The required 14-Day Hearing[4] was held on February 23, 2022. Mother, Father, Behl, Daher, Grigsby, and Uncle K.M. testified. Grigsby asked the court to continue the placement of the children with the Uncles, order services for the parents,

---

[4] TEX. FAM. CODE § 262.201(a): "In a suit filed under Section 262.101 or 262.105, unless the child has already been returned to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to possession and the temporary order, if any, has been dissolved, a full adversary hearing shall be held not later than the 14th day after the date the child was taken into possession by the governmental entity, unless the court grants an extension under Subsection (e) or (e-1)."

and find it would be dangerous for the children to be placed in either one of the parent's care. Grigsby provided several reasons for the requested relief:

> The main one is that [E.C.] test[ed] positive for drugs. We have a second child of this two parents that are testing positive for drugs, specifically for the same drug: Marijuana. Worried about the continued family violence that has continued in Massachusetts. Mom fled – not fled, came to Texas, and made statements that she came to get away from [Father]. And then within a week he's here visiting. . . .

At the hearing, Father told the court he is "not going to work any services" to have E.C. returned to him because "I don't think there's any reason for me to work any services." He also testified he believes the Department is going to take the kids away whether he does services or not. Father stated he would participate in services if he believed there was a "reasonable probability" the Department would change its position on him. Father asserted he did not think it would be helpful for him to go to anger management counseling or a batterer's intervention prevention program. But he would be willing to go to private counseling if it is not provided by the Department.

Following the hearing, the trial court signed a temporary order appointing the Department as E.C.'s temporary managing conservator, appointing Mother and Father temporary possessory conservators, and ordering Mother and Father to participate in specific services. The children were also ordered to remain in their current placement with the Uncles.

The temporary order required Father to participate in multiple services, which included participating in the Father FOCUS program and the Batterers Intervention

and Prevention Program (BIPP), applying to participate in the Moral Reconation Therapy program and participating if accepted, undergoing a psychological evaluation, psychiatric evaluation, and drug/alcohol assessment, and maintaining stable, suitable housing and suitable, stable, legal employment. Father was also subject to random drug and alcohol urinalysis / hair strand tests. On March 18, 2022, the Department issued a letter to Father setting out those court ordered services and providing Father the names and contact information for service providers.

Father moved to Laramie, Wyoming in June or July 2022. He gave the Department his Wyoming address on July 13, 2022.

The Court held a Permanency Review Hearing on September 27, 2022. Behl told the court she had provided a list of resources in Wyoming on August 10, 2022, and encouraged him to find his own providers if the resources she found did not work out. At the time of the September 27 hearing, however, Father had not reported to Behl that he was participating in any of the services. Father told the court he understood the services he was being asked to complete, understood he could seek out his own services and provide proof of completion, and knew trial was set for December 12, 2022. After that hearing, Mother contacted Behl and told her that she wanted to relinquish her parental rights, stating: "I will never get rid of [Father] if I don't." Mother voluntarily relinquished her rights to V.C. and E.C. in October 2022.

The Department's termination suit was tried to the bench on March 20, 2023 and April 10, 2023. The following witnesses testified at trial: Father, Behl, Grigsby,

–13–

Daher, Uncle I.G., Court Appointed Special Advocate (CASA) Karuna Thomas, and Department caseworker Janell Dickerson. On May 30, 2023, the trial court signed a Final Order terminating Mother and Father's parental rights to E.C. and appointing the Department E.C.'s Permanent Non-Parent Sole Managing Conservator. The Final Order includes the trial court's predicate section 161.001 findings:

> The Court finds by clear and convincing evidence that [Father] has:
>
> > 1. failed to support the child(ren) in accordance with his ability during a period of one year ending within six months of the date of the filing of this petition; [Tex. Fam. Code 161.001(b)(1)(F)]
> >
> > 2. failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child(ren) who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child(ren)'s removal from the parent under Chapter 262 for the abuse or neglect of the child(ren); [Tex. Fam. Code 161.001(b)(1)(O)]
>
> **IT IS THEREFORE ORDERED** that the parent-child relationship between [Father] and the child the subject of this suit, is terminated and is in the best interest of [E.C.].

The children remained in their placement with the Uncles. This appeal followed.

## STANDARD OF REVIEW

Because the fundamental liberty interest of a parent in the care, custody, and control of her child is one of constitutional dimensions, involuntary parental termination must be strictly scrutinized. *In re C.V.L.*, 591 S.W.3d 734, 748 (Tex. App.—Dallas 2019, pet. denied) (first citing *Troxel v. Granville*, 530 U.S. 57, 65–

–14–

66 (2000); then citing *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); and then citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). In parental termination cases, due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE § 161.001(b). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (quoting TEX. FAM. CODE § 101.007).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re C.V.L.*, 591 S.W.3d at 748. "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* (quoting *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018)). Under both legal and factual sufficiency standards, we (i) consider all the evidence, (ii) defer to the factfinder's credibility determinations, and (iii) determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* (quoting *In re A.C.*, 560 S.W.3d at 630–31).

When conducting a legal-sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding

but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *In re C.V.L.*, 591 S.W.3d at 748. We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id.* We disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.* at 748-49.

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the State's allegations against the parent. *In re C.V.L.*, 591 S.W.3d at 749. Further, the appellate court must consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* "And in making this determination, the reviewing court must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *Id.*

In this case, the jury found Father engaged in conduct prohibited by paragraphs (F) and (O) of section 161.001(b)(1), and that termination was in the best interest of E.C. See Tex. Fam. Code § 161.001(b)(1)(F), (O); Tex. Fam. Code § 161.001(b)(2).

**ANALYSIS**

"Texas Family Code section 161.001(b) allows for involuntary termination of parental rights if clear and convincing evidence supports that a parent engaged in one or more of the twenty-one enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d at 232. Here, the trial court's order terminated Father's rights on two grounds—sections 161.001(b)(1)(F), and (O)—in addition to finding that termination was in E.C.'s best interest. In three issues, Father challenges the legal and factual sufficiency of the evidence supporting termination under subsection (O) and supporting the finding that termination was in E.C.'s best interest. We address each issue in turn.

**I.      Trial court's predicate findings for termination**

A court may terminate a parent-child relationship upon findings by clear and convincing evidence: (1) the parent engaged in one or more of the courses of conduct defined by § 161.001(b)(1)(A)–(T), and (2) termination is in the child's best interest pursuant to section 161.001(b)(2). TEX. FAM. CODE §§ 161.001(b)(1), 161.001(b)(2). Here, the trial court terminated Father's parental rights based on subsections (F) and (O). TEX. FAM. CODE § 161.001(b)(1)(F), (O).

Section 161.001(b)(1)(F) requires clear and convincing evidence the parent "failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition; . . ." TEX.

FAM. CODE § 161.001(b)(1)(F). Section 161.001(b)(1)(O) requires clear and convincing evidence the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months *as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;* . . .

*Id.* § 161.001(b)(1)(O) (emphasis added).

On appeal, Father does not challenge the trial court's finding he failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition. *See id.* § 161.001(b)(1)(F). "Unchallenged predicate findings are binding" on the appellate court. *In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We may affirm the termination order based on the subsection F violation alone if we conclude the evidence was legally and factually sufficient to support the jury's finding that termination is in the child's best interest. *See In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014) ("Clear and convincing proof of any one ground will support a judgment terminating parental rights, if similar proof also exists that termination is in the child's best interest.") (citing *In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013)); *see also In re E.A.F.*, 424 S.W.3d at 750 ("Only one predicate finding is required.").

Because only one predicate finding under section 161.001(b)(1) is necessary to support an order of termination when there is also a finding that termination is in a child's best interest, we need not address the sufficiency of the evidence supporting

the trial court's predicate findings under either subsection (F) or (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also In re A.I.F.*, No. 07-17-00464-CV, 2018 WL 2272604, at *3 (Tex. App.—Amarillo May 17, 2018, no pet.) (mem. op.) (first citing *In re A.V.*, 113 S.W.3d at 362, then citing *In re T.N.*, 180 S.W.3d 376, 384 (Tex. App.—Amarillo 2005, no pet.), and then citing TEX. R. APP. P. 47.1). We, therefore, overrule Father's second issue challenging the predicate finding under section 161.001(b)(1)(O).

## II.    The best interest finding.

In his final issue, Father challenges the legal and factual sufficiency of the evidence to support the trial judge's finding that terminating Father's parental rights was in E.C.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

### A.    Applicable law

A court may not terminate a parent's rights unless it finds by clear and convincing evidence that termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(2). The best-interest element is child-centered and focuses on the child's wellbeing, safety, and development. *In re M.K.*, No. 05-23-00090-CV, 2023 WL 4229818, at *5 (Tex. App.—Dallas June 28, 2023, no pet.) (mem. op.) (citing *In re T.J.*, No. 05-22-00954-CV, 2023 WL 1988838, at *9 (Tex. App.—Dallas Feb. 14, 2023, no pet.) (mem. op.)). A judicial determination of the "best interest" of a child "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No.

05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, "best interest" is "a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id.* (quoting *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding)); *see also In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.) ("[P]arental rights may not be terminated merely because a child might be better off living elsewhere.").

The supreme court has identified nine factors that may assist our review of a best-interest finding:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors focus on the best interest of the child, not the best interest of the parent, and are not exhaustive. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *In re C.H.*, 89 S.W.3d at 27.

A best interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence the parental relationship endangered the child's safety. *See In re C.H.*, 89 S.W.3d at 27. Undisputed evidence

–20–

of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *D.M. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00137-CV, 2017 WL 2628949, at \*4 (Tex. App.—Austin June 13, 2017, no pet.) (mem. op.). On the other hand, the presence of scant evidence relevant to each factor will generally not support such a finding. *In re C.H.*, 89 S.W.3d at 27. Further, the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.— Dallas 2014, pet. denied).

In addition, the Texas Family Code sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *In re C.V.L.*, 591 S.W.3d at 748 (first citing TEX. FAM. CODE § 263.307(b), and then citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing family code section 263.307 and *Holley* as containing factors to consider "when determining whether termination of parental rights is in the best interest of the child")). The statutory best-interest factors include the following factors relevant to the case:

> (1) the child's age and physical and mental vulnerabilities;
>
> (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;
>
> (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and
>
> (F) an understanding of the child's needs and capabilities.

TEX. FAM. CODE § 263.307(b)(1), (6), (7), (8), (10), (11), (12).

Although courts may consider any other factor relevant to the child's best interest, there is "[a] strong presumption ... that a child's best interests are served by preserving the parent-child relationship, where possible." *In re D.D.M.*, 2019 WL 2939259, at *5 (quoting *Burns v. Burns*, 434 S.W.3d 223, 230 (Tex. App.—Houston [1st Dist.] 2014, no pet.)); *In re R.R.*, 209 S.W.3d at 116 ("there is a strong

presumption that the best interest of a child is served by keeping the child with a parent").

## B. Application of law to facts

Here, Father argues the evidence supporting the best interest finding is sparse, conclusory, and focuses disproportionality on the child's positive living situation with the Uncles. We disagree.

### 1. E.C.'s age, vulnerability, needs, and desires

E.C. was three years old when the case was tried, so he was too young to have any desires relevant to the best-interest analysis. The record shows, however, E.C. had specific medical and developmental needs not being met before being placed with the Uncles. MDCF believed E.C. received no medical care for the first six months to a year E.C. lived with Mother and Father in Massachusetts. When he was first placed with the Uncles in January 2022, E.C. was aggressive at daycare, was suffering from speech delays, and had recurring hearing problems and ear infections. The Uncles obtained the medical and developmental support and treatments E.C. needed. E.C. is now receiving speech therapy services through Plano ISD and was diagnosed as autistic. E.C. also had surgery for the placement of ear tubes to address recurrent ear infections and hearing problems.

Michell Behl, Mother's caseworker, Uncle I.G., and the CASA testified E.C. has shown improvement in his health and behavior. Behl confirmed E.C. had improved his expressions and decreased his aggression level while in the Uncles'

care. Uncle I.G. reported many improvements. He told the court E.C. has had speech services since he was placed with the Uncles, and his speech and physical health have improved: "His weight is right on target. His health is very good right now. The speech is improving a lot." Uncle I.G. explained further:

> Right now just – [E.C.] is doing very good. I think he's healthier than he's been in his little few years, and then I just want to make sure he stays like that. I want to make sure he stays in a place that's -- where he has just quiet and no fighting and no drugs and safe. That's my goal, that's [Uncle K.M.'s] goal to keep the kids safe at all times.

CASA also observed "huge significant improvements" in E.C.:

> So when [E.C.] initially came into placement, he was little, he was agitated, there were challenges with his behavior especially daycare, but over the span of over a year -- in fact, let's say within the first six months with the ear tubes and all of the medical support that he – speech therapy, he tremendously improved.

> I mean, now the child has so much enthusiasm. He's so well taken care of. His health has improved significantly and there is nothing but good feedback even from the school that I visited recently. His speech, the way he interacts and engages has changed 180 over the course of time. So the uncles leaves [sic] no stone unturned when it comes to taking him to all the appointments and making sure all his needs are met from medical, school, to daycare, to speech therapy and now that he's in school.

The trial judge could reasonably conclude from this evidence, Father's history of drug use, domestic violence, and Department involvement here and in Massachusetts, and Father's failure to provide E.C. with adequate medical care for his physical, mental, and developmental needs that it is unlikely Father would be able to meet E.C.'s needs in the future. We conclude the evidence regarding these

factors supports the trial judge's best-interest finding. *See In re M.K.*, 2023 WL 4229818, at *5–6.

### 2. History of abusive or assaultive conduct

The record shows a history of verbal and physical abuse between Mother and Father and among family members within the Massachusetts home. For example, in December 2018, Father plead guilty to a Class C domestic violence charge for assaulting Mother. According to Father, Mother's foot got caught in a door as he was shutting it, and he was only arrested because the maternal grandmother was "always quick to call the police" to get him arrested. During the V.C. proceedings when Mother was pregnant with E.C., Father pushed Mother during an argument and Mother was taken to the emergency room.

Father also has a history of assaultive conduct against others. In 2021, he was arrested for assault with a deadly weapon in Rhode Island following a "brawl" at a campsite. Father testified the charge was lowered to a misdemeanor and dismissed, but provided the court no documentation to confirm that result. He also admitted to being charged in Massachusetts for threatening his step-dad George's ex-girlfriend. He stated that charge was also dismissed and again failed to produce documentation to prove that assertion. Similarly, in October 2021, Father and his brother were arrested in Massachusetts following a fight with each other. Moreover, Mother relinquished her rights to the children for their safety and to keep them free of Father. Further, Father refused to participate in any counseling, anger management classes,

or the Batterers Intervention and Prevention Program (BIPP) demonstrating he took no steps to address his history of assaultive and abusive conduct.

Under this record, the trial court could reasonably conclude Father would remain abusive and volatile if he had custody of E.C. We conclude the evidence regarding this factor supports the trial judge's best-interest finding.

### 3.    History of substance abuse

Father testified he began smoking marijuana when he was fifteen and last smoked marijuana the week before trial when he was in Colorado. Father maintained he never smokes around the children. E.C., however, tested positive for marijuana at the time of removal on January 11, 2022. Mother and Father blamed each other for E.C.'s positive drug test. At the 14-Day Hearing, Mother testified she believed E.C. was exposed to marijuana because of Father's daily use of the drug. At trial, Father accused Mother of smoking marijuana in the bedroom of the Massachusetts home and insisted he only smoked in a downstairs apartment in which the children were not allowed to enter. Mother, however, tested negative for marijuana before and after the 14-Day Hearing. Father, in contrast, tested positive for THC on a December 12, 2022 urinalysis test performed in Laramie, Wyoming. Despite orders in Texas for random drug testing, he failed to be tested prior to the December 12, 2022 test. Moreover, Father's testimony indicated he did not intend to end his marijuana use and, rather than take responsibility for potentially exposing E.C. to marijuana, he accused Mother of smoking in the child's presence. Father admits he

is a drug user and repeatedly testified he has the right to smoke marijuana if his children are not present.

The trial court could reasonably infer Father's failure to address his marijuana use would lead to continued drug use. *See In re J.D.*, 436 S.W.3d at 118 (stating a fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent); *In re M.L.G.J.*, No. 14-14-00800-CV, 2015 WL 1402652, at *10–11 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.). Under this record, the trial court could reasonably conclude Father would continue using drugs if he had custody of E.C. We conclude the evidence regarding this factor supports the trial judge's best-interest finding.

### 4. Father's willingness and ability to seek, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision

By his own admission, Father refused to engage in court-ordered services during the underlying proceedings. He also testified he did not believe he did anything to cause E.C.'s removal. Father insisted he should not be required to participate in services and the court should recognize he was not given sufficient time to complete the services. The record shows Father was given fourteen months to complete the services before trial.

Father took a similar position in Massachusetts; refusing to voluntarily engage in services offered by the MDCF. Moreover, he and Mother chose to flee to

Massachusetts rather than face further Department intervention after Behl discovered Father entering Mother's apartment at the end of the V.C. proceedings.

At trial, Father testified he understood what services he was ordered to complete and confirmed he did not complete any services ordered. Father did not complete the psychological and psychiatric evaluation, did not undergo a substance abuse evaluation, and did not participate in the Batterers Intervention and Prevention Program (BIPP). Father provided various excuses for why he could not participate in or complete the ordered services. For example, he testified he worked in the logging industry and could not speak to providers because of poor cell service when he was working. Father also stated the providers in Laramie are limited in number and often work only with the college students who live there. According to Father, he provided no documentation of efforts to contact service providers because he just "played phone tag" with them. Some of Father's other reasons for not completing service included a lack of time and resources. He did not complete a parent education class because he "didn't have time to do them," and did not complete the Father Focus program because he hasn't "had the resources at the time to get them completed, any of the services." Father stated he did not start any services when he lived in Massachusetts because he was working and "was never given any service providers or list of services" while he lived there. The weather in Wyoming also purportedly hampered Father's efforts to engage in court-ordered services. He testified he called the Casper CPS office about services, but it was winter, and the

roads were shut down for weeks. He also insisted he could not figure out how to do services online and he "got ignored" when he asked the court to help him.

Behl testified she assisted Father when he was in Wyoming by providing a list of possible service providers in Wyoming. Father, however, did not follow-up with Behl after she gave him the provider information. He did not inform her of providers he found, or update her on whether he found a provider from the service list. He did not call her again to ask for assistance with the services. According to Behl, Father has not provided any certificate or documentation regarding services completed.

In a court's best interest analysis, it is appropriate to consider evidence showing the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d at 249 (findings under section 161.001(1)(O) can support best interest finding); *In re J.T.G.*, No. 14–10–00972–CV, 2012 WL 171012, *17 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (considering failure to participate in services required for reunification in best-interest determination). Here, it is undisputed Father failed to perform any court-ordered services in Texas. Father's failure to engage in the programs ordered in the Family Service Plan supports the trial court's best-interest finding. *See In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied).

### 5. Father's parental abilities, including his ability to provide E.C. with minimally adequate living conditions and health support

We see no evidence that Father possesses the parental ability or skill to raise E.C., and there is ample evidence to the contrary. Father refused to participate in parent education classes. Behl testified she is concerned there has been no change in Father's attitude and no knowledge gained because he has not worked the services. Behl told the court she does not believe Father has made any progress or appreciates why E.C. came into the Department's care.

Uncle I.G. told the court he had concerns about Father having even limited custody of E.C. because Father had not participated in or gained the knowledge and skills needed to parent E.C.

> My concern is [E.C.] is a busy little boy. My concerns is for just what I see in our -- how he doesn't have that patience. Sometimes he's real good, sometimes he is very upset with [E.C.] because [E.C.] doesn't want to communicate. There was a time when I had to cut it off because [E.C.] was just not talking, didn't want to even look at the camera and he went from his regular, hey, buddy, what's going on to, oh, you want to do that? You don't want to talk to me? That's when I'm like, well -- so, yes, I'm concerned about that.

Uncle I.G. also testified Father and Mother are "still communicating" and he does not think their relationship "is completely over." Mother told him she doesn't know what she wants and "this is why she let the kids go. She doesn't want the kids to go back and repeat what just happened." He is also concerned Father could use E.C. to get to Mother if Father had custody of E.C.

Father insisted he would do anything to have custody of E.C., but he failed to do anything required of him by the Department to obtain custody. Father failed to provide E.C. with medical care in Massachusetts and showed no concern when E.C. tested positive for marijuana. He also did not offer to provide monetary support to the Uncles for E.C.'s care. Although Father testified he was gainfully employed and had a lease on a three-bedroom apartment, he did not provide the Department with any documentation, such as copy of the apartment lease or pay stubs, to confirm his employment and living conditions. We conclude that substantial, nonconclusory evidence relevant to these factors supports the trial judge's best-interest finding.

### 6. The plans for E.C. and the stability of the proposed placement

These factors also weigh in favor of termination. The Uncles plan to adopt E.C. and V.C. They testified their main concern is to keep the children healthy and safe in their care. The evidence showed E.C.'s health has dramatically improved since the removal, and he is receiving consistent health care, including management of sinus infections, insertion of ear tubes, and speech therapy. The CASA testified E.C. is safe with the Uncles, there is stability and security there, and she has observed "the huge significant positive change in the children's well-being from the time they entered the placement until now." By remaining in the Uncles' custody, both children will grow up together and will be able to interact with Mother and her family.

Father's plans for E.C. were not settled. He testified he did not know if he would stay in Wyoming or move back to Texas if he was given custody of E.C. If he decided to stay in Wyoming, he told the court his employer would allow him to work exclusively in Wyoming and would not require him to travel to Colorado to work during the week. He provided no documentation to support those statements. Further, Father's rights to V.C. were previously terminated. If he was given custody of E.C., the children would be raised separately.

Moreover, everyone who testified to E.C.'s best interest, except for Father, believes termination is in E.C.'s best interest. Uncle I.G. believes it is in the children's best interest to grow up in a household where there is no violence, no drug use, and not in a state of continual chaos. Because of Father's volatile demeanor and past aggression, Uncle I.G. does not think Father can provide E.C. with a safe environment. Mother relinquished her rights to the children for their safety and to make sure they are free of Father. That decision supports Uncle I.G.'s view of Father's inability to provide a safe environment.

The CASA also testified termination is in E.C.'s best interest.

> From what CASA has observed, yes, [Father] has kept his visits, virtual visits and a couple of in person visits with [E.C.], but the concern remains that he's not completed any of the Court-ordered services, has been unwilling to give any information on income, and continues to state that he smokes marijuana. What I've observed, [E.C.] over more than a year now is he's in a safe, stable and secure home or placement where all of his needs are being taken care of and he needed those additional needs especially with speech and medical with his ear tubes.

So the concern is there could be a disruption of all that given the domestic violence, the abuse and the drug conditions that has come to light.

Based on her observations of the children, she believes "there was definitely trauma. There was definitely emotional trauma…" CASA also noted E.C. is well cared for with the Uncles: "They're loving as well as supported and CASA has seen a tremendous change, specifically with [E.C.], since January 2022 to March of 2023, significant change, positive."

Behl testified allowing Father to retain any conservatorship right would not be in E.C.'s best interest because "[I]t hampers with permanency of the child, prevents him from being adopted. It is just going to be confusing" because Father's parental rights to V.C. have already been terminated. She also noted "[t]he caregivers have expressed several concerns about safety, and I don't truly believe that he would follow the court orders." Finally, Behl stated she is concerned about Father's continued drug use and the possibility Father could "abscond with" E.C.

Finally, the ad litem reported E.C. "is thriving in his current placement." The ad litem concluded it is in E.C.'s best interest to remain with the Uncles and for Father's rights be terminated.

Based on this evidence, we conclude that the trial judge could reasonably conclude that these factors supported the best-interest finding.

**7. Father's acts and omissions indicating that the existing parent-child relationship is not a proper one and any excuses for same**

It is undisputed Father did not participate in or provide proof of participation in any of the services listed in his service plan. Father did not initiate any services or provide any substantiated reason for not performing the services. Father testified he did not have time to engage in services because he was working and provided various excuses for not finding service providers in Wyoming or Colorado where he lived and worked. He failed to provide any documentary evidence of his purported efforts to contact services provider.

Further, Father did not complete any anger management class, the BIPP, or anything related to domestic violence. It is also very concerning that E.C. tested positive for marijuana. Father's testimony showed he took no responsibility for the positive test and did not understand why a positive test might be an issue for E.C. CASA cited those issues as further reasons why she did not think Father should have unsupervised visits with E.C.

On this evidence, the trial judge could reasonably conclude that these factors supported the best-interest finding.

**C. Conclusion regarding best interest finding**

After reviewing all the evidence in the light most favorable to the trial judge's best-interest finding and considering any undisputed contrary evidence, we conclude the trial judge could reasonably form a firm belief or conviction that E.C.'s best

interest would be served by terminating Father's parent-child relationship with him. In analyzing the legal sufficiency of the evidence, we assume the trial court, as factfinder, resolved disputed facts in favor of its finding for termination of parental rights because a reasonable factfinder could do so in this case. *See In re Baby Girl H.*, No. 05-23-00487-CV, 2023 WL 7485748, at *13 (Tex. App.—Dallas Nov. 13, 2023, no pet. h.) (mem. op.). In analyzing the factual sufficiency of the evidence, we do not find the disputed evidence to be so significant that the trial court could not have formed a firm belief or conviction in favor of termination of parental rights. *See id.* Considering the evidence under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's parental rights was in the best interest of E.C. We overrule Father's third issue.

## III. Fit-Parent Presumption

In his first issue, Father argues the evidence was insufficient to overcome the fit-parent presumption and the constitutional rights afforded to him. A parent has a constitutional right to the care, custody, and control of her child. *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). And when the government seeks not only to infringe on this fundamental right, but to terminate the right altogether, such termination is considered "traumatic, permanent, and irrevocable" and "constitutes the 'death penalty' of civil cases." *In re J.C.H.-P.*, 673 S.W.3d 262, 264 (Tex. App.—San Antonio 2023, no pet.). As extensively discussed above, the trial court could have

formed a firm belief or conviction Father engaged in a course of conduct that endangered E.C.'s physical or emotional well-being and termination of his parental rights was in E.C.'s best interest. To assert Father's "sole transgression" was Father delivering groceries to "Mother and the child into the Mother's home, while Mother was not present" is unsupported by the record and a myopic view of the evidence. Under the facts of this case, the Department overcame the fit parent presumption, and Father has not shown he was denied any other constitutional due process. We overrule Father's first issue.

## CONCLUSION

Having overruled each of Father's appellate issues, we affirm the trial court's judgment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

230586F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF E.C., A CHILD

No. 05-23-00586-CV        V.

On Appeal from the 199th Judicial District Court, Collin County, Texas
Trial Court Cause No. 199-30006-2022.
Opinion delivered by Justice Partida-Kipness. Justices Reichek and Miskel participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that APPELLEE recover its costs of this appeal from APPELLANT.

Judgment entered this 19th day of December 2023.